# UNITED STATES DISTRICT COURT

# DISTRICT OF IDAHO

| | |
|---|---|
| CLAY BEACH, et al., | Case No.:  CV 08-416-N-EJL-REB |
| Plaintiffs, | **REPORT AND RECOMMENDATION** |
| vs. | |
| JD LUMBER, INC. AND JEFFREY WEIMER, | |
| Defendants. | |

Currently before the Court are Defendants' Motion for Summary Judgment (Docket No. 26) and Plaintiffs' Cross-Motion for Summary Judgment (Docket No. 32).  These matters have come before the undersigned United States Magistrate Judge pursuant to a referral from United States District Judge Edward J. Lodge  (Docket Nos. 15, 43).  The Court has carefully reviewed the record, considered the oral argument of counsel at the November 2, 2009 hearing, and now enters the following Report and Recommendation.

## I.  BACKGROUND

The Plaintiffs' claims begin with the Worker Readjustment and Retraining Notification Act ("WARN Act"), a federal statute that requires employers to provide affected employees with 60 days notice prior to a plant closure or mass layoff (hereafter, the "Notice Period").  The threshold issue here is whether Plaintiffs, who received 60 days notice of a mass layoff, could be terminated without WARN Act protections before the Notice Period had run.  Plaintiffs seek compensation for the time between their termination date, August 22, 2008, and the end of the

**REPORT AND RECOMMENDATION - 1**

Notice Period.  Plaintiffs also seek treble damages under state law protections for employees who do not receive their full earned wages, under the Idaho Wage Claim Act.

Defendant JD Lumber is in the lumber-processing business.  *Affidavit of Jeffrey Weimer* ("Weimer Affidavit), ¶ 3 (Docket No. 26-6); *Affidavit of David Slaughter* ("Slaughter Affidavit), ¶ 21.  In August 2008, JD Lumber owned a lumber mill, planer, and related equipment, as well as certain real property, including approximately 5,000 acres of timberlands.  *Weimer Affidavit*, ¶ 3 (Docket No. 26-2); Ex. V, *Declaration of David Whedbee* (May 1, 2009 Deposition of Jeffrey Weimer ("Weimer Depo."), 52:21-23, 57:5-9 (Docket No. 29-13).  Defendant Jeffrey Weimer is the President and an owner of JD Lumber.   *Weimer Affidavit*, ¶ 2 (Docket No. 26-2).

In March or April, 2008, Defendants began discussing the possibility of an asset sale with Riley Creek, one of JD Lumber's competitors.   *Slaughter Affidavit*, ¶ 3 (Docket No. 26-5); *Weimer Affidavit*, ¶ 3 (Docket No. 26-6); *Weimer Depo*. 51:8-15 (Docket No. 29-13).  Ultimately, Riley Creek proposed to purchase certain assets of JD Lumber, including the milling facility, plant, and equipment.  *Weimer Depo.*, 51:4-11 (Docket No. 29-13); Ex. A, *Declaration of David Whedbee* (April 30, 2009 Deposition of Joe Veltri ("Veltri Depo."), 71:24-72:6 (Docket No. 29-4).  JD Lumber would retain the timberlands.  *Veltri Depo.*, 88:5-7 (Docket No. 29-4).  As part of the planned sale, Defendants anticipated closing the mill and terminating all employees on October 3, 2008.  *Slaughter Affidavit,* ¶ 3 (Docket No. 26-5); *Weimer Affidavit*, ¶ 4 (Docket No. 26-6).

Prior to the sale, JD Lumber employed two shifts of workers who, together, processed an average of 1,650,000 board feet of lumber per week, taking into account the variation in processing speed for different species of wood. *Weimer Depo*, 41:2-15, 70:5-12 (Docket No. 29-

**REPORT AND RECOMMENDATION - 2**

13).  Of that weekly amount, the second shift processed, on average, approximately 165,000 board feet per day.  *Id.* at 47:19-25, 66:8-10.

On August 1, 2008, JD Lumber, through Defendant Weimer, provided verbal notice to all employees that they would be laid off as of October 3, 2008.  *Slaughter Affidavit,* ¶ 4 (Docket No. 26-5)*.*  On the following day, JD Lumber gave written notice to all employees of a "mass layoff" resulting from "an asset purchase sale with a competitor whereby the competitor is purchasing the sawmill plant, property, and equipment."  *Slaughter Affidavit*, Ex. A. (Docket No. 26-5).  The written notice states that all employees "will be officially separated from employment [with JD Lumber] on October 3, 2008."  *Id.*

On August 22, 2008, prior to the end of the Notice Period, JD Lumber terminated 40 employees on the second shift, including Plaintiffs.  *Weimer Affidavit, ¶* 7 (Docket No. 26-6); *Slaughter Affidavit*, ¶¶  17-18 (Docket No. 26-5).  JD Lumber alleges that, despite its best efforts to acquire logs, there was an unforeseen log shortage in August 2008 that forced JD Lumber to terminate the second shift.  *Id.*  An August 22, 2008 memorandum to affected employees states that "due to unforeseen business circumstances caused by . . . sudden, dramatic and unexpected weather and market conditions affecting the entire lumber industry in this area, JD Lumber is, at this point, running only one shift because of a lack of logs."  *Slaughter Affidavit*, Ex. D (Docket No. 26-5).  The memorandum also describes the lack of logs as follows:

> Due to the bad housing market, lumber prices have fallen to historic low levels, and JD Lumber is finally not able to purchase logs at affordable prices to run two shifts.  As a result, JD Lumber does not have the necessary work hours and revenue that would be generated from the work hours to run two shifts and fully compensate you under WARN during the 60-day notice period.

*Id.*

**REPORT AND RECOMMENDATION - 3**

JD Lumber subsequently shut down the entire mill on September 25, 2008.  *Weimer Depo.*, 106:15-16 (Docket No. 29-13).  To prepare the mill for closing, JD Lumber stopped receiving agency and industrial logs on September 12, 2008 and stopped receiving private logs on September 19, 2008.  *Id.* at 107:1-22.

In a transaction that closed on October 20, 2008, JD Lumber sold its assets pursuant to the Amended and Restated Asset Purchase Agreement ("Asset Purchase Agreement").[1]  *See Veltri Depo.*, 71:24-72:11 (Docket No. 29-4); Ex. A, *Declaration of Mel Crawford* (Docket No. 50-2).  Under the Asset Purchase Agreement, Idaho Forest Group LLC ("Idaho Forest Group") is identified as the purchaser of JD Lumber's assets.  *Id.* at p. 1.  Idaho Forest Group is an entity into which Riley Creek had been merged at an earlier date.  *Weimer Depo.*, 51:4-11, 52:1-9 (Docket No. 29-13).

The Asset Purchase Agreement includes at least three provisions relating to the sale and purchase of JD Lumber's logs.  For example, the Asset Purchase Agreement itself provides that the purchase price for the mill and equipment will be increased to account for any log inventories existing at the mill at closing.  *Id.* at p. 4 ("At Closing, the Purchase Price shall be increased by an amount equal to the total value of the Log Inventories existing on the Closing Date . . . .").  In addition, as part of the Asset Purchase Agreement, JD Lumber and Idaho Forest Group entered into a Master Log Purchase Agreement.  Ex. B, *Declaration of Mel Crawford* (Docket No. 50-2).  Under the Master Log Purchase Agreement, JD Lumber agreed to provide to Idaho Forest Group 33.5 MMBF (million board feet) of logs and stumpage harvest rights "from the Effective Date through the term hereof."  *Id.* at p. 1.  Also under the Master Log Purchase Agreement, Idaho

_____

[1]  The Asset Purchase Agreement, dated October 18, 2008; identifies August 3, 2008 as the "Effective Date."  Ex. A, *Declaration of Mel Crawford*, p. 1 (Docket No. 50-2).

**REPORT AND RECOMMENDATION - 4**

Forest Group agreed to pay a $50 price premium on all logs from JD Lumber's timberlands, "both within and beyond the Term." *Id*. at p. 2. Weimer negotiated the premium on behalf of JD Lumber, because of his concerns that the price of logs would fall after the asset purchase sale, and he would have nowhere to sell his logs. *Weimer Depo.*, 81:12-82:22 (Docket No. 29-13).

## II. SUMMARY JUDGMENT

### A.   Summary of Arguments

Defendants seek summary judgment on all Plaintiffs' claims. Defendants first argue that the WARN Act does not apply to Plaintiffs' terminations. *Memorandum in Support of Summary Judgment*, p. 3 (Docket No.26-2). Alternatively, Defendants argue that, if the WARN Act applies, the "unforeseen business circumstances" exception shields them from liability, because an unforeseen log shortage led to the Plaintiffs' termination prior to the 60 day notice period. *Id.* at p. 8. Further, Defendants argue that, even if Plaintiffs prevail on the WARN Act claims, Plaintiffs are not entitled to treble damages under the Idaho Wage Claim Act. *Id*. at p. 12.

Plaintiffs filed a cross-motion for summary judgment arguing that the WARN Act applies to their terminations and they are entitled to treble damages under the Idaho Wage Claim Act. *Plaintiffs' Cross-Motion for Summary Judgment* (Docket No. 32). Plaintiffs also oppose Defendants' motion for summary judgment arguing that there is a genuine dispute of fact concerning the unforeseen business circumstances exception to WARN Act liability. *Plaintiffs' Response to Defendants' Motion for Summary Judgment* (Docket No. 29). According to Plaintiffs, the lack of logs was the result of the Asset Purchase Agreement and therefore within Defendants' control, not an unforeseen market event as Defendants argue. *Id.*

**REPORT AND RECOMMENDATION - 5**

**B.      Summary Judgment Standard**

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure.  In pertinent part, the rule provides that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

When the non-moving party has the burden of proof at trial, summary judgment is mandated if the non-moving party fails to make a showing sufficient to establish the existence of an element which is essential to the non-moving party's case or claim.  "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  *Accord, Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  The moving party meets its initial burden on the motion by either: (1) pointing out that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial or (2) producing affirmative evidence demonstrating that the nonmoving party will be unable to prove its claim or defense.  *Celotex*, 477 U.S. at 325; *Nissan Fire & Marine Ins.*, 210 F.3d at 1102.

When the moving party has the burden of proof at trial, it also has the initial burden on summary judgment of establishing the absence of a genuine issue of fact on each essential element of its case.  *See Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  To carry this burden, the moving party must develop a record sufficient to entitle it to a directed verdict if the evidence went uncontroverted at trial.  *Id.* (citations omitted).

**REPORT AND RECOMMENDATION - 6**

In either case, if the moving party meets its initial burden on summary judgment, then the non-moving party, in order to defeat the motion, must produce evidence sufficient to create a genuine dispute of material fact. *See* Fed. R. Civ.P. 56(e). Consistent with the directed verdict standard, the moving party is entitled to judgment only if no reasonable jury could find for the non-moving party. *See Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Thus, "the mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient," *id.*, and the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

In ruling on a motion for summary judgment, the court must view all of the evidence in a light most favorable to the non-moving party and must not make credibility findings. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1140 (9th Cir. 2003). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Suzuki Motor Corp.*, 330 F.3d at 1140. In applying these standards, the Court is mindful that:

> The evidence presented at trial often differs markedly from that which is offered in a party's summary judgment papers. The propositions claimed in affidavits may or may not be proved at trial. Some witnesses turn out to be credible; some do not. Some inferences that seemed tenuous at summary judgment appear quite reasonable in light of the evidence at trial.

*Id.*

## III.  ANALYSIS

There are four issues raised by the parties' motions: (1) the dismissal of Defendant Weimer from the lawsuit; (2) the applicability of the WARN Act to Plaintiffs' terminations; (3) the applicability of the unforeseen business circumstance exception to the WARN Act; and

**REPORT AND RECOMMENDATION - 7**

(4) whether an award under the WARN Act constitutes "wages" subject to treble damages under the Idaho Wage Claim Act.  As set forth in greater detail below, the undersigned recommends granting summary judgment to Defendants on the first and fourth issues, because the parties agree that Defendant Weimer should be dismissed from the lawsuit and the definition of wages under the Idaho Wage Claim Act does not include an award of "back pay" under the WARN Act.  However, genuine disputes of fact preclude summary judgment on the second and third issues, which require, at least in part, a factual determination regarding causation, i.e., whether Plaintiffs were terminated as a result of the mill closing or as a result of a log shortage caused by unforeseen circumstances separate and apart from the mill closing.

**A.**     **Defendant Jeffrey Weimer Should Be Dismissed from This Lawsuit.**

Jeffrey Weimer was originally named as a Defendant in this lawsuit but Plaintiffs have conceded that he should be dismissed.  *See Plaintiffs' Response to Defendants' Motion for summary Judgment*, p. 1, n. 1 (Docket No. 29).  Accordingly, Defendants' Motion for Summary Judgment should be granted with regard to Mr. Weimer, who is not a proper party to this lawsuit.

**B.**     **Issues of Fact Preclude Summary Judgment as to Whether the WARN Act Applied to the August 22, 2008 Terminations.**

Both parties seek summary judgment on the issue of whether the WARN Act applies to Plaintiffs' terminations.  *Cross-Motion for Summary Judgment* (Docket No. 32).  Plaintiffs bear the burden of proof on this issue at trial.

There is no dispute that the WARN Act applied on August 2, 2008, when JD Lumber provided written notice to approximately 220 employees that it would be closing down the mill within 60 days.  *See Defendants' Statement of Undisputed Facts*, ¶¶ 2, 4 (Docket No. 26-3); *Plaintiff's Statement of Facts*, ¶ 21 (Docket No. 29-2).  It is also undisputed that 40 employees,

**REPORT AND RECOMMENDATION - 8**

including Plaintiffs, who were on the second-shift, lost their jobs on August 22, 2008, before the Notice Period had run. *See Defendants' Statement of Undisputed Facts*, ¶ 20 (Docket No. 26-3). The dispute is whether the Plaintiffs, who were part of a protected class under the WARN Act as of August 2, 2009, could be terminated on August 22, 2008, prior to the end of the Notice Period, without WARN Act protections.

**1.      WARN Act Coverage**

The WARN Act requires employers to provide their employees with sixty days' notice of impending job terminations resulting from a "plant closing" or "mass layoff." *See* 29 U.S.C. § 2102(a)(1). Generally, if such notice is not provided, then the employer is liable for up to sixty days' pay and benefits to those employees who lost their jobs. *See* 29 U.S.C. § 2104(a).

To constitute a "plant closing" or "mass layoff" under the Act, the employment losses must affect at least 50 employees. The Act defines "plant closing" as:

> [T]he permanent or temporary shutdown of a single site of employment, or one or more facilities or operating units within a single site of employment, if the shutdown results in an employment loss at the single site of employment during any 30-day period for 50 or more employees. . . .

29 U.S.C. § 2101(2). The Act defines "mass layoff" as a reduction in force that:

> (A) is not the result of a plant closing; and

> (B) results in an employment loss at the single site of employment during any 30-day period for--

> (i)(I) at least 33 percent of the employees (excluding any part-time employees); and

> (II) at least 50 employees (excluding any part-time employees); or

> (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(3).

**REPORT AND RECOMMENDATION - 9**

To prevent situations in which employees are terminated from employment in groups that number below the statutory minimums in order to evade the WARN Act requirements, the Act also allows for the aggregation of separate groups of employees in order to meet the requisite number of employees necessary to constitute a "plant closing" or "mass layoff." In pertinent part, the WARN Act provides as follows:

> [I]n determining whether a plant closing or mass layoff has occurred or will occur, employment losses for 2 or more groups at a single site of employment, each of which is less than the minimum number of employees specified in section 2101(a)(2) or (3) of this title but which in the aggregate exceed that minimum number, and which occur within any 90-day period shall be considered to be a plant closing or mass layoff unless the employer demonstrates that the employment losses are the result of separate and distinct actions and causes and are not an attempt by the employer to evade the requirements of this chapter.

29 U.S.C. § 2102(d).

**2.     Plaintiffs' Motion for Summary Judgment on the Issue of WARN Act Coverage Should Be Denied.**

Based exclusively upon the undisputed dates of notice and termination of employment, Plaintiffs contend that summary judgment is warranted in their favor as a matter of law. Plaintiffs argue that any terminations occurring after the notice date and prior to the end of the Notice Period run afoul of the statute. "As members of the 217 employees who initially received notice, Plaintiffs were entitled to a full 60-day notice as 'affected employees' as defined in 29 U.S.C. § 2101(a)(5)." *Plaintiffs' Response to Defendants' Motion for Summary Judgment*, p. 2 (Docket No. 29). Because they were terminated prior to the Notice Period, Plaintiffs argue the facts support a WARN Act violation as a matter of law.

This argument misses the mark; relying on the notice and termination dates alone do not automatically entitle Plaintiffs to recovery under the WARN Act. It is undisputed that Plaintiffs

**REPORT AND RECOMMENDATION - 10**

were "affected employees" as of August 2, 2008, the date they received notice of the "mass layoff" due to the mill closing.  However, as "affected employees" with regard to the mass layoff, Plaintiffs are entitled to notice of the mass layoff, which they received.  In order to demonstrate that the WARN Act applies to their terminations, Plaintiffs must also demonstrate that they are "aggrieved employees" who suffered an employment loss *as a result of* a mass layoff or plant closure.  *See* 29 U.S.C. § 2104 (emphasis added).

To enforce the WARN Act notice requirements, Plaintiffs must bring an enforcement action.  Under the Act's enforcement provisions, there are several classes of plaintiffs who may enforce the WARN Act notice requirements, including "aggrieved employees." *See* 29 U.S.C. § 2104; *United Food and Commercial Workers Union Local 751 v. Brown Gp.*, 517 U.S. 544, 548 (1996).[2]  Plaintiffs must prove that they are "aggrieved employees" in order to have a WARN Act claim.  "Any employer who orders a plant closing or mass layoff" in violation of the statute's 60-day notice provisions, is "liable to each aggrieved employee who suffers an employment loss *as a result of* such closing or layoff."  29 U.S.C. § 2104(a)(1)(emphasis added).

Here, Plaintiffs have focused exclusively upon their status as "affected employees," for the purposes of summary judgment and have relied exclusively upon the undisputed facts regarding the notice and termination dates.  To succeed on their claims, however, Plaintiffs must demonstrate that their terminations resulted from the lumber mill closure and "mass layoff" identified in the August 2, 2008 notice.  While there are facts in the record to support such a

---

[2]  The term "aggrieved employee" is defined in the WARN Act as "an employee who has worked for the employer ordering the plant closing or mass layoff and who, as a result of the failure by the employer to comply with section 2102 of this title, did not receive timely notice either directly or through his or her representative as required by section 2102 of this title."  29 U.S.C. § 2104(a)(7).

**REPORT AND RECOMMENDATION - 11**

contention, these facts are disputed, as reflected in the Court's discussion of the "unforeseen business circumstance" exception to WARN Act liability discussed, *infra.* The fact of such an alternative reason for the termination of Plaintiffs' employment, even though they were otherwise "affected" employees under the WARN act, creates a genuine issue of material fact that precludes, for the purposes of summary judgment, the granting of Plaintiff's motion. Thus, their motion should be denied.

3. **Defendants' Motion for Summary Judgment on the Issue of WARN Act Coverage Should Be Denied as Moot.**

Defendants argue that the August 22, 2008 layoff was not covered by the WARN Act, because the 40 employees terminated was an insufficient number of employment losses to trigger WARN Act coverage. *See Defendants' Memorandum in Support of Summary Judgment*, p. 4 (Docket No. 26-2). In addition, anticipating that the Plaintiffs would rely upon the aggregation provisions included in the statute, *see* 29 U.S.C. § 2102(d), Defendants argue that Plaintiffs cannot aggregate their employment losses with the employment losses occasioned by the lumber mill closing, because: (1) the employment losses are the result of separate and distinct actions and causes and (2) the statute does not allow the Court to aggregate separate phases of employment losses where, as Defendants contend occurred here, one loss is below the statutory threshold and the other is above such amount. *Id.* at pp. 4-5.

However, Plaintiffs do not raise the argument anticipated by Defendants and have not provided the Court with argument or authority in response to Defendants' motion for summary judgment on the issue of aggregation, as is required by Dist. Idaho Local Civ. R. 7.1(c). Instead, Plaintiffs argue that the number of employees let go on August 22, 2008 is irrelevant, because these terminations occurred during the Notice Period and it is undisputed that the WARN Act

**REPORT AND RECOMMENDATION - 12**

applied at the time notice was given.  *Plaintiffs' Response to Defendant's Motion for Summary Judgment*, p. 6 (Docket No. 29).  This argument reflects Plaintiffs' underlying contention and implicit assumption that their terminations resulted directly from the mill closing identified in the August 2, 2008 notice.

Because Plaintiffs do not raise the argument anticipated by Defendants, Defendants motion for summary judgment should be denied as moot on the issue of WARN Act coverage. There simply is no dispute for the Court to resolve--Plaintiffs do not seek to aggregate the employment losses suffered on August 22, 2008 with any other employment losses at the plant in order to trigger the WARN Act notice requirements.  Rather, their claims rise and fall upon their contention that they are "affected" employees as of the date of the notice of the plant closing, and the ultimate issue of whether they are able to prove that they are also "aggreived" employees.

**C.      There is a Dispute of Fact Precluding Summary Judgment on the Unforeseen Business Circumstance Exception to the WARN Act.**

Defendants argue that, even if the WARN Act applies to Plaintiffs' terminations, they are shielded from liability, because these terminations resulted from "unforseen business circumstances."  *Memorandum in Support of Summary Judgment*, pp. 8-12 (Docket No. 26-2). Defendants contend that, despite their best efforts to obtain logs, they had to terminate Plaintiffs within the Notice Period because of an unforeseeable log shortage.  *Id*. at 9.  Defendants have the burden at trial of establishing that the unforseen business circumstances exception to liability applies notwithstanding the fact that  "[b]ecause the WARN Act is remedial legislation, its exceptions are to be construed narrowly."  *Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 641 (4th Cir.1997).

**REPORT AND RECOMMENDATION - 13**

Under the "unforeseen business circumstances" exception to WARN Act liability, an employer is immune from liability if "the closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time that notice would have been required." 29 U.S.C. § 2101(b)(2)(A).  To meet their burden at trial, Defendants must demonstrate that (1) the log shortage was unforeseeable, and (2) the layoffs were caused by the log shortage.  *See Roquet v. Arthur Andersen LLP*, 398 F.3d 585, 588 (7th Cir.2005); *Gross v. Hale*, 554 F.3d 870, 875 (10th Cir. 2009).

> **1.  There is a Dispute of Fact Regarding the Existence of an Unforeseeable Log Shortage.**

To meet the statutory standard, Defendants must prove that the log shortage was not reasonably foreseeable at the time notice would have been required.  29 U.S.C. § 2101 (b)(2)(A).  Such a circumstance exists when "caused by some sudden, dramatic, and unexpected action or condition outside the employer's control."  *See* 20 C.F.R. § 639.9(b)(1); *see also Allen v. Sybase, Inc.*, 468 F.3d 642, 655 (10th Cir. 2006).

The analysis of an unforeseen business circumstance "focuses on an employer's best business judgment."  20 C.F.R. § 639.9(b)(2); *Allen*, 468 F.3d at 655-56.  This objective test requires commercial reasonableness, and the judgment required is specific to the employer's industry, not the market as a whole.  *Id.*  "The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market. The employer is not required, however, to accurately predict general economic conditions that also may affect demand for its products or services."  20 C.F.R. § 639.9.  As described by the 8th Circuit:

> The WARN Act necessarily recognize[s] that even the most
> conscientious employers are not perfect, and ... thus allow[s]

**REPORT AND RECOMMENDATION - 14**

> needed flexibility for predictions about ultimate consequences that,
> though objectively reasonable, proved wrong. So long as it may
> still fairly be said that the eventual plant closing or mass layoff is
> caused by a sudden, dramatic, and unexpected event outside the
> employer's control, the exception applies.

*Loehrer v. McDonnell Douglas Corp*., 98 F.3d 1056, 1061 (8th Cir.1996).

Here, for the purposes of summary judgment, Defendants have set forth sufficient evidence to demonstrate the existence of a log shortage. Defendants offer affidavit evidence that JD Lumber was not able to acquire logs from private suppliers in the quantities it had obtained in previous years. *Slaughter Affidavit,* ¶ 12 (Docket No. 26-5); *Weimer Affidavit*, ¶¶ 6, 8-11 (Docket No. 26-6). Further, they identify efforts to make up for the lack of logs from private sources by attempting to get more logs from public and/ or governmental sources, efforts they contend were not sufficiently availing to justify a second shift at the mill. *Slaughter Affidavit*, ¶¶ 13, 16 (Docket No. 26-5).

Defendants have also set forth evidence indicating that the log shortage was not reasonably foreseeable. Defendants' evidence indicates that, initially, the log shortage was thought to be caused by unusually heavy snow conditions in the forest. Later, it was determined that the log shortage was the result of larger market forces at work. *See Slaughter Affidavit*, ¶ 11 (Docket No. 26-5); *Weimer Affidavit*, ¶ 11 (Docket No. 26-6). The August 22, 2008 memorandum regarding the shutdown of the second shift refers to "sudden, dramatic and unexpected weather and market conditions affecting the entire lumber industry in this area." *Slaughter Affidavit*, Ex. D (Docket No. 26-5).

Plaintiffs have challenged the persuasiveness of the Defendants' evidence on these contentions and countered such evidence with their own additions to the record. Plaintiffs contend that in the summer of 2008, there were several reasons that contributed to the alleged

**REPORT AND RECOMMENDATION - 15**

log shortage at JD Lumber and any shortage that occurred was caused, at least in part, by JD

Lumber's actions, undermining any argument that the log shortage was not foreseeable.

*Plaintiffs' Response to Defendants' Motion for Summary Judgment*, pp. 8-9 (Docket No. 29).

Alternatively, Plaintiffs contend that, to the extent the log shortage was caused by adverse

market or weather conditions, JD Lumber was aware of such conditions "long before August

2008." *Id.* at p. 15.

In support of the argument that there was no log shortage, Plaintiffs contend JD Lumber

owned three types of logs that were available to be milled.  First, JD Lumber owned timberlands,

which contained a potential harvest volume of 5,793,640 board feet as of April 30, 2008.  *See*

*Weimer Depo.*, 59:11-17 (Docket No. 29-13).[3]  Second, JD Lumber transferred 2,593,746 board

feet of timber to Riley Creek between August 24 and October 4, 2008.  *See Veltri Depo.*, 62:11-

66:16 (Docket No. 29-4).  Third, JD Lumber's sold approximately 1,330,000 board feet of its

cedar log inventory to other mills, between June 1 and August 22, 2008.  *See Veltri Depo.*, 55:8-

58:21 (Docket No. 29-4).[4]  According to Plaintiffs, these logs were available if JD Lumber chose

to mill them and could have kept both shifts working until the mill closed.

---

[3]  Defendants argue that this lumber was not ready to be harvested; however, it is
undisputed that these logs were subject to the $50 price premium set forth in the Asset Purchase
Agreement.  Therefore, reading the facts in a light most favorable to Plaintiffs as the non-moving
party on this issue, the Plaintiffs are entitled to the inference that Defendants were financially
better off to hold onto these logs and later sell them to Riley Creek at a premium price.

[4]  Although Defendants contend the cedar logs did not hold enough value to justify being
milled, Plaintiffs counter with facts suggesting there was sufficient warehouse space to protect
an inventory of milled cedar; Defendants were able to convert 2,000,000 of 6,000,000 board feet
into finished product; and 1,000,0000 board feet was sold by May 1, 2009.  *See Weimer Depo.*,
73:17-10, 77:16-20, 78:4-14, 79:6-10 (Docket No. 29-13).  Weighing the competing inferences
in Plaintiffs' favor for the purposes of summary judgment, the Court will consider the cedar logs
available for the second shift to process.

**REPORT AND RECOMMENDATION - 16**

Hence, there exist genuine issues of material fact precluding summary judgment for Defendants on this issue.  Reasonable inferences can drawn from the facts that would describe the log shortage, in some part or in whole, as the foreseeable result of Defendants' transactions and not the result of an unforeseeable weather related shortage of logs or a change in the market of logs being offered for sale.  Although these facts and inferences are subject to different interpretations, in the current motion context, they serve to defeat Defendant's motion for summary judgment on this particular defense.

<strong>2.        There is a Dispute of Fact As to Why Plaintiffs Were Terminated.</strong>

Entwined with the discussion of whether the log shortage was foreseeable or not is the question of what caused the end of Plaintiffs' employment, which is at the heart of the parties' dispute.  For the purposes of the unforeseen business circumstances exception, Defendants must prove that the Plaintiffs' terminations resulted from the log shortage.

There is sufficient prima facie evidence in the record to support Defendants' claim, moving forward, that Plaintiffs were terminated because of a log shortage.  First, although to state the fact is not the same as to establish the fact, the August 2, 2008 and August 22, 2008 notices contain different language describing the reason for the layoff.  The August 2, 2008 notice clearly identifies the Asset Purchase Agreement as the cause for the October layoff.  *See* Ex. A, *Slaughter Affidavit* (Docket No. 26-5).  In contrast, the August 22, 2008 notice identifies a log shortage as the cause for the earlier (than previously notified) terminations.  *Id.* at Ex. D.

JD Lumber's witnesses also state that the August 22, 2008 layoffs resulted from a lack of logs.  *See Weimer Affidavit* (Docket No. 26-6); *Slaughter Affidavit* (Docket No. 26-5); *Weimer Depo*. 184:22-185:17 (Docket No. 29-14).  According to such witnesses, the log shortage developed over the course of the year, as JD Lumber was "unable to obtain" the number of logs

<strong>REPORT AND RECOMMENDATION - 17</strong>

it typically obtained from its largest private sources.  *Weimer Affidavit* at ¶¶ 8-11 (Docket No. 26-6); *Slaughter Affidavit*, ¶ 7 (Docket No. 26-5).  Slaughter, a manager at JD Lumber, says that prior to August 2008, he thought the low supply of logs from local suppliers was due to unusually large amounts of snow still in the woods.  *Slaughter Affidavit*, ¶ 11 (Docket No. 26-5).  Slaughter anticipated that the logs would become available to the mill once the snows had melted and the ground dried out, so that log suppliers could reach and harvest their standing timber.  *Id.*  However, between May 1, 2008 and September 19, 2008, JD Lumber was still only able to obtain logs from private suppliers in far smaller quantities than in prior years.  *Id.* at ¶ 12.  Slaughter was left with the conclusion that, by August 22, 2008, JD Lumber would be unable to find sufficient logs to maintain operating two shifts of employees until the first-announced mill closure date of October 3, 2008.   Therefore, JD Lumber management made the decision to terminate the second shift on the earlier date.  *Id.* at ¶ 17.

If uncontroverted, this evidence would support Defendants' claim that the Plaintiffs' terminations resulted from the log shortage.  However, Plaintiffs have put forth sufficient evidence to create a genuine dispute of fact on this issue.  Plaintiffs argue that the true cause of the terminations was not an alleged log shortage but the circumstances surrounding the Asset Purchase Sale.  Three facts, summarized below, support a reasonable inference that Plaintiffs' terminations resulted, at least in part, from the Asset Purchase Agreement.

First, the sales negotiations leading to the Asset Purchase Agreement started in March or April of 2008 and, as a part of the sale agreement, JD Lumber agreed to provide 33.5 MMBF of timber to Idaho Forest Group.  Reasonable inferences drawn from these facts include that JD Lumber, anticipating an eventual mill closing with a set price for any existing lumber on site, had no incentive to mill any logs prior to sale.  Further, as time proceeded and the closing date

**REPORT AND RECOMMENDATION - 18**

became increasingly imminent, JD Lumber had to clean up the milling and planer facilities in preparation for the asset sale, creating an additional disincentive to mill logs.  News of the impending sale, disseminated in the local community and advertised in the local paper, could have led private suppliers to take their available logs to other mills for purchase.

Second, the Master Log Purchase Agreement required Idaho Forest Group to pay a price premium on logs from JD Lumber's timberlands, so that JD Lumber would receive a higher than market price for such logs.  It can be reasonably inferred, for purposes of the pending motions, that such a premium price created an incentive for JD Lumber to sell such logs to Idaho Forest Group, rather than to run them through the mill.

Third, records reflect that JD Lumber transferred 2,593,746 board feet of lumber to Riley Creek between August 24 and October 4, 2008.  A reasonable inference, drawn in favor of Plaintiffs, is that these transfers show that Defendants were selling logs to Riley Creek in anticipation of the sale, rather than replenishing inventory.

In light of these competing facts, the Court cannot determine, as a matter of law, that Plaintiffs were terminated as a result of an unforeseen log shortage.  There are conflicting facts and inferences related to both the existence of an unforseen log shortage and whether such a log shortage resulted in Plaintiffs' terminations.  Therefore, Defendants' Motion for Summary Judgment on the applicability of the unforeseen business circumstances exception to the WARN Act is foreclosed.

> **D.**   **WARN Act Damages, in the Context of this Case, are Not Subject to Trebling under the Idaho Wage Claim Act.**

Defendants argue that any potential award under the WARN Act cannot constitute "wages" under the Idaho Wage Claim Act, because the award is not based on an amount of time

**REPORT AND RECOMMENDATION - 19**

Plaintiffs actually worked.  *Memorandum in Support of Summary Judgment*, p. 13 (Docket No. 26-2).  Plaintiffs argue that the "back pay" provisions under the statute are compensatory in nature and, thus, wages subject to the Idaho Wage Claim Act trebling provisions.  For the reasons set forth below, the Court finds that WARN Act damages, though referred to as "back pay" and compensatory in nature, do not constitute "wages" within the meaning of the Idaho Wage Claim Act.

Under the Idaho Wage Claim Act, an employee is entitled to payment of all wages due upon termination.  "Upon layoff, or upon termination of employment by either the employer or employee, the employer shall pay or make available at the usual place of payment all wages then due the employee . . . ."  I.C. § 45-606.  The Idaho Act further allows claimants to file wage claims "in any court of competent jurisdiction" and, if successful, to collect three times the amount of "unpaid wages found due and owing."  I.C. § 45-615.  The term "wages" is defined in the statute to mean "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece or commission basis."  I.C. § 45-601(7).

WARN Act damages do not fit this description.  Though based on wages and compensatory in nature, the back pay provision is not "compensation for labor or services rendered by an employee."  Instead, back pay damages are provided in lieu of wages.

The WARN Act states, "[a]ny employer who orders a plant closing or mass layoff in violation of section 2102 of this title shall be liable to each aggrieved employee who suffers an employment loss as a result of such closing or layoff for . . . back pay for each day of violation."  29 U.S.C. § 2104(a)(1).  Like wages, a back pay award includes compensation for work days in the violation period, *Bearns v. Stone Forest Indus. Inc.*, 147 F.3d 1182, 1184 (9th Cir. 1998), and

**REPORT AND RECOMMENDATION - 20**

any tips and vacation leave.  *Local Jt. Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1160 (9th Cir. 2001).

Nonetheless, the pay is not necessarily connected to the concept of services rendered, as required by the Idaho Wage Claim Act.  Instead, "[t]he term back pay has traditionally been understood to mean a sum equal to what [employees] normally would have earned had the violation not occurred."  *Bearns*, 147 F.3d at 1185 (9th Cir. 1998).  This is consistent with "the statutory purpose of providing a two-month uninterrupted income stream facilitating a job search."  *Id.* at 1184.  Significantly, however, the employee does not provide any services in exchange for the back pay compensation.

Idaho case law supports this interpretation.  For example, Idaho courts have found the following constitute wages subject to treble damages:

(1)     unpaid commissions due on the date of termination, *Goff v. H.J.H. Co.*, 95 Idaho 837, 521 P.2d 661 (1974); *Polk v. Larrabee*, 135 Idaho 303, 17 P.3d 247 (2000);

(2)     performance bonus earned prior to termination, *Neal v. Idaho Forest Indus., Inc.*, 107 Idaho 681, 691 P.2d 1296 (Ct. App. 1984); and

(3)     severance pay set forth in employer's policy manual and due upon termination, *Johnson v. Allied Stores Corp.*, 106 Idaho 363, 679 P.2d 640 (1984).[5]

In contrast, Idaho courts have found that the following are not wages within the meaning of the Idaho Wage Claim Act: the cash value of a life insurance policy, *see Neal*, 107 Idaho 681, 691 P.2d 1296, and a contractual liquidated damages provision, *see Moore v. Omnicare*, 141

---

[5]     In *Johnson*, the Idaho Supreme Court held that severance pay is a "wage" within the meaning of I.C. § 45-608, the Idaho Wage Claim Act statute of limitations provision, because it is "a component of the compensation in an employment agreement" and "not a mere gratuity." *Id.* at 367, 679 P.2d at 644.

**REPORT AND RECOMMENDATION - 21**

Idaho 809, 118 P.3d 141 (2005).  These contractual provisions, though part of the employees'

employment contract, do not reflect the type of pay for work performed required by the statute.

   The common legal fulcrum in these cases is whether or not the compensation earned

during the course of employment is based on services actually rendered.  In other words, there

must be services provided in exchange for the compensation in order for the compensation to fall

within the Idaho Wage Claim Act's definition of "damages."

   Perhaps most akin to WARN Act damages is the liquidated damages provision in *Moore*.

*See* 141 Idaho 809; 118 P.3d 141.  In *Moore*, the Idaho Supreme Court considered an

employment contract with a liquidated damages provision that was triggered if the employee was

terminated without cause.  *Id.* at 819, 118 P.3d at 151.  An arbitration panel concluded that the

liquidated damages provision was part of the parties' employment agreement and was owed to

the employee upon his termination.  *Id.*  The Idaho Supreme Court determined that this

liquidated damages award did not constitute  "wages" for the purpose of the Idaho Wage Claim

Act, because this form of compensation was "not for services rendered."  *Id.* at 820, 152.

Instead, the liquidated damages "were due and owing in the event [the employer] terminated [the

employee] 'without cause.'"  *Id.*  Similarly, any WARN Act damages due upon termination,

though based on the amount of wages an employee would have earned had proper notice been

given, do not represent compensation owed for services rendered.

   In counterpoint, arguing that the WARN Act damages should be included in the statutory

definition of "wages," Plaintiffs emphasize the compensatory scheme and purpose of the WARN

Act.  Certainly, there is case law and a pleasing logic to support such an argument.  For example,

the Ninth Circuit has held that  "'back pay' under the WARN Act is a make-whole compensatory

remedy, damages under the Act should compensate employees for the money they would have

**REPORT AND RECOMMENDATION - 22**

earned but for the premature closure. . . . " *Local Joint Exec. Bd. of Culinary/Bartender Trust*

*Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1159 (9th Cir. 2001).  This case further provides:

> While some provisions of the Act are punitive in nature, the
> primary purpose of the Act is remedial. . . .  Congress was clearly
> concerned with ensuring an income stream, or, in the words of the
> governing regulation, with "provid[ing] protection to workers,
> their families and communities." 20 C.F.R. § 639.1(a). Indeed, the
> Senate report on the "Economic Dislocation and Worker
> Adjustment Assistance Act," from which WARN's provisions were
> ultimately severed and separately enacted, explicitly stated that the
> Act's purpose was to "assur[e] the most rapid possible
> readjustment and retraining of displaced workers" and to "eas[e]
> the personal and financial difficulties for workers who must make
> these transitions." S.Rep. No. 100-62, at 3 (1987).

*Id.* at 1159.

The more precise distinction, however against the grain it may seem in light of the

remedial aims of both the federal and state statutes, is that WARN Act damages are obtained, but

not earned, because the employee does not provide services for wages, but rather recovers

damages for the loss of his or her 60-days of continued income, and the attendant opportunity to

plan for a different employment future, after learning of an impending employment loss as part

of a "plant closure" or "mass layoff."  The very fact that an employee has an entitlement to

WARN Act damages demonstrates that there were no services provided.  In other words, if the

employee had continued to work through the Notice Period, he or she would not have had a

claim for damages under the WARN Act.  Rather, he or she would have had 60 days of

continued employment in which to plan for what might come after the announced day on which

the employment would end.  Because no "work" is provided in exchange, such damages do not

fall within the definition of "wages" under the Idaho Wage Claim Act.

**REPORT AND RECOMMENDATION - 23**

Accordingly, even though the WARN Act back pay provisions are based on an employee's wage and are designed for compensatory purposes, the back pay damages do not fall within the statutory definition of "wage" under the Idaho Wage Claim Act. Therefore, it is recommended that Defendants' Motion for Summary Judgment be granted in this regard and Plaintiffs' Motion for Partial Summary Judgment denied.

## IV.  CONCLUSION

As described above, the parties agree that Defendant Weimer should be dismissed from the lawsuit. In addition, the undersigned concludes that the Idaho Wage Claim Act does not include a potential WARN Act back pay award within the term "wages" subject to the statute's trebling provision. Thus, Defendants should be awarded summary judgment on these issues.

In contrast, the Court should deny the remaining portions of Defendants' motion for summary judgment, as it cannot be determined as a matter of law that the WARN Act does not apply to Plaintiffs' claims either because the number of employees affected on August 22, 2008 was below the statutory minimum or because the unforseen business circumstances exception to liability applies. In addition, the Court should deny Plaintiffs' cross motion for summary judgment both on the issue of WARN Act applicability and as to whether any WARN Act damages, if awarded, would constitute wages subject to trebling under the Idaho Wage Claim Act.

## V. RECOMMENDATION

In accordance with the foregoing, it is hereby RECOMMENDED:

(1)     Defendants' Motion for Summary Judgment (Docket No. 26) be granted to the extent that Defendant Weimer is dismissed from the lawsuit and any WARN Act damages, if awarded, are not subject to trebling;

**REPORT AND RECOMMENDATION - 24**

(2)     Defendants' Motion for Summary Judgment be denied on the issues of WARN

Act coverage and the applicability of the unforeseen business circumstances exception to

liability; and

(3)     Plaintiffs' Motion for Cross Summary Judgment (Docket No. 32) be denied.

DATED:  **January 6, 2010**



_____
Honorable Ronald E. Bush
U. S. Magistrate Judge

**REPORT AND RECOMMENDATION - 25**