IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| CLAY BEACH, et al, ) | |
| ) | |
| Plaintiffs, ) | Case No. CV08-416-N-EJL |
| ) | |
| vs. ) | ORDER ADOPTING REPORT |
| ) | AND RECOMMENDATION |
| JD LUMBER, INC., and JEFFREY WEIMER, ) | |
| ) | |
| Defendants. ) | |

On January , 6, 2010, United States Magistrate Ronald E. Bush issued his Order and Report and Recommendation in this matter. Docket No. 56. Pursuant to 28 U.S.C. § 636(b)(1), the parties had ten days in which to file written objections to the Report and Recommendation. Defendants filed their objections on January 13, 2010. Docket No. 59. Plaintiffs filed its response to the objections on January 25, 2010. Docket No. 60.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court "may accept, reject, or modify, in whole or in part, the findings and recommendations made by the magistrate judge." Moreover, this Court "shall make a de novo determination of those portions of the report which objection is made." *Id.* In *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003), the court interpreted the requirements of 28 U.S.C. 636(b)(1)(C):

> The statute [28 U.S.C. § 636(b)(1)(C)] makes it clear that the district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise. As the *Peretz* Court instructed, "to the extent de novo review is required to satisfy Article III concerns, it need not be exercised unless requested by the parties." *Peretz*, 501 U.S. at 939, 111 S.Ct. 2661 (internal citation omitted). Neither the Constitution nor the statute requires a district judge to review, de novo, findings and recommendations that the parties themselves accept as correct. *See Ciapponi*, 77 F.3d at 1251 ("Absent an objection or request for review by the defendant, the district court was not required to engage in any more formal review of the plea proceeding."); *see also Peretz*, 501 U.S. at 937-39, 111 S.Ct. 2661 (clarifying that de novo review not required for Article III purposes unless requested by the parties) . . . .

ORDER ADOPTING REPORT AND RECOMMENDATION - Page 1
10ORDERS\beach_rnr

*See also Wang v. Masaitis*, 416 F.3d 993, 1000 & n.13 (9th Cir. 2005). Based on the objections filed in this case, the Court has conducted a de novo review of the record pursuant to 28 U.S.C. § 636(b).

## Background

The Court adopts and incorporates by reference the factual background as set forth in the Report and Recommendation:

> The Plaintiffs' claims begin with the Worker Readjustment and Retraining Notification Act ("WARN Act"), a federal statute that requires employers to provide affected employees with 60 days notice prior to a plant closure or mass layoff (hereafter, the "Notice Period"). The threshold issue here is whether Plaintiffs, who received 60 days notice of a mass layoff, could be terminated without WARN Act protections before the Notice Period had run. Plaintiffs seek compensation for the time between their termination date, August 22, 2008, and the end of the Notice Period. Plaintiffs also seek treble damages under state law protections for employees who do not receive their full earned wages, under the Idaho Wage Claim Act.
>
> Defendant JD Lumber is in the lumber-processing business. *Affidavit of Jeffrey Weimer* ("Weimer Affidavit), ¶ 3 (Docket No. 26-6); *Affidavit of David Slaughter* ("Slaughter Affidavit), ¶ 21. In August 2008, JD Lumber owned a lumber mill, planer, and related equipment, as well as certain real property, including approximately 5,000 acres of timberlands. *Weimer Affidavit*, ¶ 3 (Docket No. 26-2); Ex. V, *Declaration of David Whedbee* (May 1, 2009 Deposition of Jeffrey Weimer ("Weimer Depo."), 52:21-23, 57:5-9 (Docket No. 29-13). Defendant Jeffrey Weimer is the President and an owner of JD Lumber. *Weimer Affidavit*, ¶ 2 (Docket No. 26-2).
>
> In March or April, 2008, Defendants began discussing the possibility of an asset sale with Riley Creek, one of JD Lumber's competitors. *Slaughter Affidavit*, ¶ 3 (Docket No. 26-5); *Weimer Affidavit*, ¶ 3 (Docket No. 26-6); *Weimer Depo.* 51:8-15 (Docket No. 29-13). Ultimately, Riley Creek proposed to purchase certain assets of JD Lumber, including the milling facility, plant, and equipment. *Weimer Depo.*, 51:4-11 (Docket No. 29-13); Ex. A, *Declaration of David Whedbee* (April 30, 2009 Deposition of Joe Veltri ("Veltri Depo."), 71:24-72:6 (Docket No. 29-4). JD Lumber would retain the timberlands. *Veltri Depo.*, 88:5-7 (Docket No. 29-4). As part of the planned sale, Defendants anticipated closing the mill and terminating all employees on October 3, 2008. *Slaughter Affidavit,* ¶ 3 (Docket No. 26-5); *Weimer Affidavit*, ¶ 4 (Docket No. 26-6).
>
> Prior to the sale, JD Lumber employed two shifts of workers who, together, processed an average of 1,650,000 board feet of lumber per week, taking into account the variation in processing speed for different species of wood. *Weimer Depo*, 41:2-15, 70:5-12 (Docket No. 29-13). Of that weekly amount, the second shift processed, on average, approximately 165,000 board feet per day. *Id.* at 47:19-25, 66:8-10.
>
> On August 1, 2008, JD Lumber, through Defendant Weimer, provided verbal notice to all employees that they would be laid off as of October 3, 2008. *Slaughter Affidavit,* ¶ 4 (Docket No. 26-5). On the following day, JD

Lumber gave written notice to all employees of a "mass layoff" resulting from "an asset purchase sale with a competitor whereby the competitor is purchasing the sawmill plant, property, and equipment." *Slaughter Affidavit*, Ex. A. (Docket No. 26-5). The written notice states that all employees "will be officially separated from employment [with JD Lumber] on October 3, 2008." *Id.*

On August 22, 2008, prior to the end of the Notice Period, JD Lumber terminated 40 employees on the second shift, including Plaintiffs. *Weimer Affidavit*, ¶ 7 (Docket No. 26-6); *Slaughter Affidavit*, ¶¶ 17-18 (Docket No. 26-5). JD Lumber alleges that, despite its best efforts to acquire logs, there was an unforeseen log shortage in August 2008 that forced JD Lumber to terminate the second shift. *Id.* An August 22, 2008 memorandum to affected employees states that "due to unforeseen business circumstances caused by . . . sudden, dramatic and unexpected weather and market conditions affecting the entire lumber industry in this area, JD Lumber is, at this point, running only one shift because of a lack of logs." *Slaughter Affidavit*, Ex. D (Docket No. 26-5). The memorandum also describes the lack of logs as follows:

> Due to the bad housing market, lumber prices have fallen to historic low levels, and JD Lumber is finally not able to purchase logs at affordable prices to run two shifts. As a result, JD Lumber does not have the necessary work hours and revenue that would be generated from the work hours to run two shifts and fully compensate you under WARN during the 60-day notice period.

*Id.*

JD Lumber subsequently shut down the entire mill on September 25, 2008. *Weimer Depo.*, 106:15-16 (Docket No. 29-13). To prepare the mill for closing, JD Lumber stopped receiving agency and industrial logs on September 12, 2008 and stopped receiving private logs on September 19, 2008. *Id.* at 107:1-22.

In a transaction that closed on October 20, 2008, JD Lumber sold its assets pursuant to the Amended and Restated Asset Purchase Agreement ("Asset Purchase Agreement").[1] *See Veltri Depo.*, 71:24-72:11 (Docket No. 29-4); Ex. A, *Declaration of Mel Crawford* (Docket No. 50-2). Under the Asset Purchase Agreement, Idaho Forest Group LLC ("Idaho Forest Group") is identified as the purchaser of JD Lumber's assets. *Id.* at p. 1. Idaho Forest Group is an entity into which Riley Creek had been merged at an earlier date. *Weimer Depo.*, 51:4-11, 52:1-9 (Docket No. 29-13).

The Asset Purchase Agreement includes at least three provisions relating to the sale and purchase of JD Lumber's logs. For example, the Asset Purchase Agreement itself provides that the purchase price for the mill and equipment will be increased to account for any log inventories existing at the mill at closing. *Id.* at p. 4 ("At Closing, the Purchase Price shall be increased by an amount equal to the total value of the Log Inventories existing on the Closing Date . . . ."). In addition, as part of the Asset Purchase Agreement, JD

---

[1] The Asset Purchase Agreement, dated October 18, 2008; identifies August 3, 2008 as the "Effective Date." Ex. A, *Declaration of Mel Crawford*, p. 1 (Docket No. 50-2).

Lumber and Idaho Forest Group entered into a Master Log Purchase Agreement. Ex. B, *Declaration of Mel Crawford* (Docket No. 50-2). Under the Master Log Purchase Agreement, JD Lumber agreed to provide to Idaho Forest Group 33.5 MMBF (million board feet) of logs and stumpage harvest rights "from the Effective Date through the term hereof." *Id.* at p. 1. Also under the Master Log Purchase Agreement, Idaho Forest Group agreed to pay a $50 price premium on all logs from JD Lumber's timberlands, "both within and beyond the Term." *Id.* at p. 2. Weimer negotiated the premium on behalf of JD Lumber, because of his concerns that the price of logs would fall after the asset purchase sale, and he would have nowhere to sell his logs. *Weimer Depo.*, 81:12-82:22 (Docket No. 29-13).

The Magistrate Judge determined under his interpretation of the WARN Act that the employees terminated on August 22, 2008 were affected employees entitled to the protections of the Act, but that genuine issues of material fact existed as to whether or not a reduction in the statutory 60 day notice period was justified for unforseen business circumstances. Therefore, the Magistrate Judge recommended summary judgment on this issue be denied. All other motions decided by the Magistrate Judge have not been objected to and will not be addressed by this Court.

## Analysis

Defendants objection to the Report and Recommendation centers on the argument that the Magistrate Judge did not interpret the statute correctly and that the WARN Act provisions do not apply as the number of persons terminated on August 22, 2008 was less than 50, so the terminations cannot be considered a "mass layoff" under the statutory definition. This Court has reviewed the statute in detail and concurs in the Magistrate Judge's interpretation of the statute.

It is undisputed that JD Lumber intended the August 2, 2008 written notice to all of its 220 employees to be a WARN Act 60 day notice of a "mass layoff" resulting from the anticipated asset purchase sale which would result in the closing of the mill and termination of employment for all employees on October 3, 2008. It is also undisputed that on August 22, 2008, JD Lumber terminated 40 of the 220 employees who had been given the WARN Act notices on August 2, 2008.

The statute defines "mass layoff" to mean "a reduction in force which:

    (A)    is not the result of a plant closing; and

>> (B) results in an employment loss a the single site of employment during any 30 day period for –
>> (I) (I) at least 33 percent of the employees (excluding any part-time employees); and
>> (II) at least 50 employees (excluding any part-time employees); or
>> (ii) at least 500 employees (excluding any part-time employees).

29 U.S.C. § 2101(a)(3).

Defendants want the statute interpreted to apply the 50 person test to whether or not the August 22, 2008 terminations comprised a "mass layoff." The Court finds reading the statute in this manner eviscerates the purpose of the statute which is to give employees at least 60 days notice of a plant closing or mass layoff. If an employer could give notice to over 50 employees under the statute of a future mass layoff and then terminate 49 or fewer of the noticed employees prior to the end of the 60 day period and escape liability, 49 or fewer employees would be suffering the loss of employment the WARN Act is meant to prevent for a period of 60 days. Instead, Congress decided if an employer gives over 50 employees notice of a mass layoff and then terminates <u>any</u> of those "affected employees" the employer is liable for back pay for each day of violation (up to a maximum of 60 days calculated from the date of termination to the date the statutory 60 day notice period would have expired) unless an unforeseen business circumstance justifies the employer terminating any of those noticed employees prior to the 60 day notice period. 29 U.S.C. §§ 2104(a)(1) and 2102(b)(2)(A).

Defendants acknowledge they gave notice to over 50 employees of the mass layoff on August 2, 2008. This is when the 50 person test applied to determining whether or not notice had to be given and whether the event qualified as a "mass layoff." 20 C.F.R. § 639.5. The August 22, 2008 terminations were not a separate "mass layoff" that required notice under the Act, but were part of the "mass layoff" noticed on August 2, 2008. The Court agrees under the statutory definition of "mass layoff" the 40 employees terminated on August 22, 2008, would not constitute a "mass layoff, " but that is not the relevant issue before the Court. The employees who were terminated on August 22, 2008 were "affected employees" under the statute because after they received the August 2, 2008 written notice, they became "employees who may reasonably be expected to experience an employment loss as a

ORDER ADOPTING REPORT AND RECOMMENDATION - Page 5
10ORDERS\beach_rnr

consequence of a proposed plant closing or mass layoff by their employer." 29 U.S.C. § 2101(a)(5).

It is because these terminated employees were "affected employees" that created the requirement under the statute that they could not be terminated before October 3, 2008 unless the "closing or mass layoff is caused by business circumstances that were not reasonably foreseeable as of the time the notice was required" on August 2, 2008. 29 U.S.C. § 2101(b)(2)(A); 20 C.F.R. § 639.9(b)(1); *Allen v. Sybase, Inc.*, 468 F.3d 642, 655 (10th Cir. 2006). This interpretation of the statute by the Court is consistent with the remedial nature of the statute and regulations and the fact the statute and regulations should be interpreted to prevent employers from evading the purpose of the WARN Act. *See Local Union 7107 v. Clinchfield Coal Co.*, 124 F.3d 639, 641 (4th Cir. 1997). The Defendants' interpretation is respectfully rejected.

The Magistrate Judge found that there was a genuine issue of material fact as to whether the alleged log shortage was a business circumstance that was reasonably foreseeable when the August 2, 2008 WARN Act notices were provided to all 220 employees. This Court agrees a trial is required to decide if the reasonable unforeseen business circumstances alleged by Defendants and disputed by Plaintiffs allow for a reduction in the notification period under 29 U.S.C. § 2102(b)(2)(A) and an exception to liability under the WARN Act. The regulations provide an unforeseen business circumstance is "caused by some sudden, dramatic, and unexpected action or condition outside employer's control." 20 C.F.R. § 639.9(b)(1). "The employer must exercise such commercially reasonable business judgment as would a similarly situated employer in predicting the demands of its particular market." 20 C.F.R. § 639.9(b)(2). These findings can only be made after all the disputed evidence is heard by the Court and the credibility of the witnesses is considered. The objection of Defendants is denied.

Order

Being fully advised in the premises, the Court **HEREBY ORDERS** that the Report and Recommendation entered on January 6, 2010 (Docket No. 56) shall be **INCORPORATED** by reference and **ADOPTED** in its entirety.

**IT IS FURTHER ORDERED**:

(1) Defendants' Motion for Summary Judgment (Docket No. 26) is GRANTED to the extent that Defendant Weimer is dismissed from the lawsuit and any WARN Act damages, if awarded, are not subject to trebling;

(2) Defendants' Motion for Summary Judgment (Docket No. 26) is DENIED on the issues of WARN Act coverage and the applicability of the unforeseen business circumstances exception to liability; and

(3) Plaintiffs' Motion for Cross Summary Judgment (Docket No. 32) is DENIED.

**IT IS FURTHER ORDERED** that the parties will participate in some form of Alternative Dispute Resolution ("ADR"). The parties will notify the Court of the type of ADR they have selected and the date such ADR will occur. After the ADR is completed, the parties will notify the Court of the status of the case. If the ADR is unsuccessful, the Court will reschedule the court trial for the next available trial date in northern Idaho that is convenient for all parties.

DATED: **February 23, 2010**

Honorable Edward J. Lodge
U. S. District Judge